The index finger of plaintiff's right hand was seriously injured on May 8, 1941, while performing his duties as brick and stone mason under contract of employment *Page 556 
with defendant, International Paper Company, which operates a paper manufacturing plant in the City of Bastrop, Louisiana. He sues for workmen's compensation at the rate of $20 per week for four hundred weeks, less $446.16 paid him, on the theory that from the accident he has been rendered permanently totally disabled to do work of any reasonable character.
Defendant denies that the injury to plaintiff's finger has produced permanent or total disability. It concedes that the injury at different times (named in the answer) did prevent him from performing his regular work for which periods he was paid compensation, but avers that he resumed work on November 18, 1941, and in a satisfactory manner performed the duties of his employment until February 15, 1942, at which time he quit work without informing his superior officer and for that reason was discharged on February 23. In brief here, defendant's counsel state: "In the petition plaintiff complained only of an injury to the index finger and made no allegation whatever of any other injury, and therefore the only question in this case is whether or not one who has done the same work as he did prior to the injury for a period of three or four months and earned higher wages during this interim than he did at the time of the accident is entitled to compensation."
The trial judge found plaintiff to be temporarily totally disabled and gave judgment for compensation at the rate of $20 per week during disability not exceeding three hundred weeks, less amount paid on that account. Defendant appealed. Answering the appeal, plaintiff prays that the conditional term of compensation payments be increased to four hundred weeks.
Notwithstanding the injury to the finger, plaintiff continued to perform his usual work until May 20, a period of thirteen days. Infection set up and on that date the finger was giving pain so intense that he was forced to quit work and procure medical attention. He was considered able to resume work on August 29 and did so on that date. He continued to do regular work until September 6, a period of nine days, and again had to quit because of the finger's condition. His physician advised him to go to the Veterans' Hospital near Pineville, Louisiana, for medical attention as, since plaintiff is an ex-service man, treatment there would be free to him. He was a patient in this institution about two and one-half months and while there the finger was twice operated upon. After discharge therefrom he returned to defendant's plant on November 15 and worked until February 15, and again had to cease work because of the finger's condition and incident pain. He did not report to his proper superior official his inability to continue work and was absent without defendant's knowledge, for which reason on February 23 he was discharged. At that time defendant had urgent need for brick and stone masons.
For the periods worked by plaintiff subsequent to the accident, his weekly wage on an average materially exceeded that paid him prior to being injured.
The second phalange of plaintiff's finger was struck heavily by a hammer in the hands of a helper. It received a longitudinal fracture which extended into the joints. Ankylosis of the distal joints has, according to nearly all the doctors who testified, reduced flexion of the finger to at least fifty per cent, and to this extent the same degree of impairment of the member. At time of trial (May 28) the original wound and those made by the operations had satisfactorily healed. It is not shown that the finger on day of trial was sensitive to pressure, although it was swollen to some extent. It does not appear when the finger became stiff; that is, whether prior to treatment at the Veterans' Hospital or subsequent, but presumably was subsequent.
Plaintiff has followed the trade of brick and stone mason for six and one-half years. He had worked at this trade for defendant less than two years when injured.
In performing duties of brick and stone mason the right hand employs the trowel to lay mortar and break off uneven portions of brick or stone held by the left hand. Unless there be physical impairments of one or more fingers, all, with the thumb, tightly grip the handle of the trowel or other tool employed in such work.
There is no doubt that continuous use of the right hand, especially in gripping the trowel, coupled with infection, caused inflammation to set up in the index finger and that pain emanating therefrom radiated over the hand and up the arm to the elbow. This pain, we are convinced, was sufficient in intensity to force plaintiff to cease work at the several times he did so. The record proves the good faith of his efforts to carry on. The substantial increase in wage payments *Page 557 
to him for services rendered subsequent to injury should have been a stimulating influence in favor of continued work. His average weekly wage for the last period of work was nearly $50, whereas prior to injury such wage was slightly in excess of $30. The testimony of his superiors and fellow workmen establish the efficiency of work done by him after the accident.
Several eminent physicians testified in the case. All but Dr. Garnier were introduced by plaintiff. We here give epitome of and/or quote portions of their testimony touching the character and degree of disability, in their respective opinions, plaintiff suffers because of the lack of flexion of the finger and recurrent inflammation and pain.
Dr. A.G. McHenry was of the opinion that the stiffness of the finger would materially interfere with the hand's function in using the trowel or doing other heavy work requiring use of it; that use of the finger constantly would cause inflammation, swelling and pain. When asked his opinion regarding amputation of the finger he testified, in part, as follows:
"A. * * * My recommendation was to give six months to see how much he would recover in that length of time.
"Q. You did not recommend the finger be amputated at that time? A. No. He would destroy his function as brickmason probably. My opinion was he would regain the use, and might be able, if given sufficient time, to overcome some of the function and save his profession."
Dr. George W. Wright was of the opinion that plaintiff at time of trial was unable to perform the duties of brick mason. He did not advise the amputation of the finger for at least six months. He said: "Usage may bring back complete function of the finger, or function to let him work comfortably."
Dr. Wright materially modified this opinion by further testifying:
"Q. Do you intend to convey to the Court the idea that this man has no present — that this man has a fifty per cent disability in that finger, and is totally and permanently disabled? A. If he has to use that finger, yes, in the performance of his work.
"Q. I believe you stated that he had a fifty per cent disability in his finger, and you consider him totally and permanently disabled as a result of that disability? A. Yes, sir."
Dr. W.A. Rodgers thought it would be six months or a year before the finger would improve to such extent as to allow comfortable use in masonry work; that the finger's condition had improved since he first examined it; with regard to an amputation, he said:
"Q. What would you have to say with reference to Mr. Jones having that finger amputated, Doctor? A. Well, I advised against an amputation because oftentimes the inflammatory condition of a bone subsides very slowly, and I felt like he should give his finger every chance, even though it did take several months, to get well. I thought he should make that effort. But if the condition didn't improve after waiting three or four months, and if it was bothering him, I felt like probably it would be best to get it out of his way."
Dr. J.N. Jones was of the opinion that plaintiff could not "use his hand very well to work with", and added "I don't know about laying brick * * *. It was already swollen when I saw it (in February) sufficient to give a man pain if he was going to use it where he had to use much strain on it." Dr. Jones examined the finger in court and found it enlarged. He testified as follows when interrogated about amputating the finger, to-wit: "A. I don't know. I would hate to lose it if it was mine. Rather have it like that than no finger. If it gave me trouble of course, I would have it removed."
Dr. W.V. Garnier operates a clinic in Bastrop, Louisiana, to which plaintiff went for treatment when he quit work the first time. This physician testified on defendant's behalf. He examined plaintiff in March, 1942, and also a short time prior to trial of the case. He testified as follows:
"Q. On the examination which you made on March 24, 1942, what was your opinion as to whether or not he was able to resume his work? A. He had already been working some six months and it was perfectly all right for him to keep on working.
"Q. That is, you knew he had been working for a certain length of time? A. Yes. His finger was still slightly swollen and unable to flex it all the way to the palm of his hand, but he was doing his work and had been doing his work. That was self evident. *Page 558 
"Q. Then you thought he was able to continue his work that he had been doing for several months previously? A. That's right.
"Q. Did you look at this X-ray? A. Yes.
"Q. What does it reflect in your opinion? A. Nothing.
* * * * * *
"Q. Doctor, you do admit that Mr. Jones has an ankylosis or stiffness of the right forefinger, don't you? A. Yes, sir.
"Q. You admit that he cannot flex his finger properly, don't you? A. Yes, sir.
"Q. And you admit that the finger at this time is badly swollen? A. Slightly swollen compared to the left. However, the X-ray don't show it.
"Q. I ask you to look at the finger and state whether or not it is swollen there. A. I will admit that the last time I saw it, it was swollen.
"Q. Is it swollen at this time? A. Yes, sir.
"Q. Still ankylosis and stiffness of the finger? A. Slight ankylosis and stiffness there.
"Q. When you examined Mr. Jones on March 22, 1942, isn't it a fact that you told Mr. Jones that he couldn't go back to work and do any work? A. That I don't remember. Possibly I might have said he should lay off for awhile.
"Q. Why do you come and testify he could go back to work and do the work when you told him he should lay off? A. I said if he had been doing the work, which was self evident; he said if he laid off for awhile maybe he would be all right."
The testimony of the medical experts leads us to think it more than probable that should plaintiff for about six months not engage in work requiring constant strain upon the index finger, its use thereafter in masonry work might not cause inflammation. Whether by pursuing this course the stiffness in the finger will be reduced or entirely eliminated, we are not warranted in making a guess. However, it is made quite clear that the lack of flexion is not the exclusive cause of plaintiff having to quit work. In each instance the pain and discomfort following the inflammation and swelling forced him to do this.
All of the physicians are in accord that plaintiff at time of trial was disabled to perform work that would require use of his right hand. A fair composite of their testimony with respect to the duration of plaintiff's disability is that if he will cease using his right hand and give it competent medical attention for six months, it could then be determined if it would be advisable for him to resume his former trade. If, however, it was then determined either from physical examination and manipulation or work test that he could no longer perform the work of a brick and stone mason without aggravating the pre-existing infection and bringing on inflammation and swelling, removal of the entire finger would be the logical thing to do. If this should be done, of course, the question of the extent or degree of disability on that account would then be presented for determination. In view of the foregoing, it may safely be said that the duration of plaintiff's disability is definitely uncertain. The evidence certainly does not establish whether the disability is temporary or permanent. It does establish that at the time of trial the disability was total to perform the sort of work he was performing when injured.
It has frequently been held, in fact is now well settled in this state, under such facts, that Subsection 1 (b) of Section 8 of the Employers' Liability Act, Act No. 242 of 1928, p. 357, providing for compensation payments for four hundred weeks in case of permanent disability, and not Subsection 1 (a) of Section 8, of said law, relative to temporary disability, has application. Mancil v. J.B. Beaird Corporation, La.App.,7 So.2d 385; Thornton v. Mercer, La.App., 199 So. 407; Schneider v. Travelers' Insurance Co. et al., La.App., 172 So. 580; King v. McClanahan et al., 3 La.App. 117.
It is equally as well settled by the jurisprudence that the provisions of the Employers' Liability Act establishing a schedule of compensation payments for the loss or loss of use of specific members of the body have no application in cases where total disability results from the loss, the loss of use of, or serious impairment of a member or members of a workman who does manual and/or hard labor for a livelihood. Barr v. Davis Bros. Lumber Co., 183 La. 1013, 165 So. 185; McGruder v. Service Drayage Company, Inc., 183 La. 75, 162 So. 806; Custer v. New Orleans Paper Box Factory, Inc., et al., La.App., 170 So. 388; Harris v. Southern Carbon Co., La.App., 182 So. 370; Hibbard v. Blane et al., La.App., 183 So. 39. *Page 559 
And, in Pierce v. Cochran Franklin Co., Inc., 175 So. 170-173, this court said and held: "* * * it makes no difference as to the percent of injury if the injury is sufficient to disable one from performing the work he is accustomed to do or work of a reasonable character which he is qualified to perform."
Defendant argues that an award of compensation in this case would be contrary to the decisions in: Colbey v. Edwards Chevrolet Co. et al., La.App., 186 So. 884; Chancellor v. Continental Lumber Tie Co., 6 La.App. 370; Barnes v. American Can Co., 7 La.App. 597.
The contention is not well founded. We have read the cited cases and find that the facts of each may easily be differentiated from those practically admitted in the present case.
The lower court fixed the fee of Drs. Wright and McHenry as expert witnesses at $75 each. Appellant challenges the correctness and justice of the allowances, charging that the fees are exorbitant and out of line, the facts and circumstances considered.
Each of these physicians deservedly enjoys a lucrative practice in the City of Monroe, and doubtless absence from their business for only a few hours entails some financial loss to them. They each charged $100 to appear and testify in the case. Plaintiff, through his counsel, is obligated to pay them this amount.
The City of Monroe is less than thirty miles from the City of Bastrop where trial was had. Each of the doctors drove to Bastrop, testified and was able to return to Monroe by the noon hour and each was on the witness stand less than one hour. The nature of the impairment of the finger was such that no special study and preparation were required to enable them to intelligently testify concerning same and give professional opinion thereon.
As both physicians resided in another parish they could not have been forced to attend the trial and testify under subpoena. Their testimony could easily have been procured under some of the several laws providing for the taking of testimony of witnesses residing without the parish in which the case is pending. Of course, it is much more satisfactory to adduce testimony of this character in open court.
Act No. 19 of 1884 governs the fixing by the courts of fees of expert witnesses "called to testify in court", and concludes as follows: "* * * shall receive additional compensation, to be fixed by the court, with reference to the value of the time employed and the degree of learning or skill required."
The Orleans Court of Appeal in Penouilh et al. v. Toye Brothers Yellow Cab Co. et al., 1 So.2d 131, fixed the fee of a physician who had attended trial of the case five days and was on the witness stand a part of each day, at $25 per day, and in doing so based the fixing upon the provisions of the 1884 Act. Hare v. New Amsterdam Casualty Company et al., La.App., 1 So.2d 439-442. This court has heretofore considered and fixed fees due medical experts when summoned to attend court and testify in cases being tried in the place wherein they live, and has said that $25 per day was adequate compensation for such services. English v. Kellogg Lumber Company et al., La.App., 200 So. 167.
We see no good reason for allowing a physician, who attends court and testifies as an expert in a case being heard not over one hour's drive from his place of business, more than would be allowed him were he to employ the same time in attending and testifying in the same case if pending in his own parish. The element of time employed in each instance is practically the same and the character of testimony given is the same. The difference of a short ride should not alter the situation; especially should this be true when it is possible and practical to procure such physician's testimony by commission or otherwise as fixed by law. We think that a fee of $25 each for these physicians, all things considered, sufficient compensation.
When this case came on for argument, defendant's counsel filed motion to remand wherein it is alleged that plaintiff secured employment as guard at the Dixie Ordnance Plant at Sterlington, in May or June of the present year, and it is believed he now holds said position and receives a salary in excess of $125 per month for his services. The prayer of the motion is that the case be remanded "for the purpose of taking evidence on the question of disability since trial of this case". The only supporting evidence tendered with the motion is the affidavit of one of defendant's counsel who to the best of his information, knowledge and belief, swears that the facts of the motion are true and correct. While we do not doubt the good faith of counsel in *Page 560 
preparing, filing and making affidavit to the motion, still if there existed no other good reason for denying the same, we would feel justified in doing so for lack of adequate supporting evidence. If plaintiff has been earning a salary as alleged, positive proof of that fact could likely be procured without much difficulty.
This motion on the merits presents the same question tendered in a like motion in the case of Emza Wiley v. Frost Lumber Industries, Inc., 11 So.2d 285, decided by this court on October 30, 1942, wherein we said:
"Section 20 of the Employers' Liability Act, Act No. 20 of 1914, as amended by Act No. 85 of 1926, provides that a judgment for compensation may be judicially modified at any time after lapse of six months subsequent to rendition thereof on the ground that the incapacity of the employee has subsequently diminished or increased. Judgment in this case was rendered April 25, 1942. The six month period mentioned in the statute will expire on October 25, 1942. The right to ask for modification of the compensation award will thereafter arise.
"The identical question tendered by the motion arose in Daniels v. Shreveport Producing Refining Corp., 151 La. 800, 92 So. 341, 342, which was prior to the 1926 amendment reducing the period before modification could be asked, from twelve months to six months. It was held in that case as reflected from the syllabus, that:
"`Under Act No. 38 of 1918, § 20, providing for modification of a compensation judgment or for review at any time after one year, a compensation case will not be remanded for the taking of testimony as to an alleged increase in plaintiff's wage earning capacity since the trial, where the year has almost expired, as this would deprive judgments of all stability or value.'"
The motion for said reasons is denied.
For the reasons herein assigned, the judgment appealed from is amended to the extent of fixing the duration for payments of compensation during plaintiff's disability at not more than four hundred weeks, and by reducing the fees of Drs. Wright and McHenry to $25 each; and, as thus amended, said judgment is affirmed with costs. *Page 616