The plaintiff, Jerry E. Spillman, filed this suit against the L. O. Stocker Company and its insurer, Hartford Accident and Indemnity Company, in which he seeks to recover under the Compensation Act, Act No. 20 of 1914, as amended, for an injury received on October 17, 1947 while he was engaged as an iron worker for the defendant company. There is no dispute as to the accident nor the manner in which it happened; that is, that the index finger of plaintiff's left hand was caught under a jack lever and severely mashed and crushed. The plaintiff was paid compensation for three weeks at the rate of $20.00 per week, and on November 17, 1947 he returned to work for the defendant company at the same rate of pay; however, on February 17, 1948 plaintiff filed this suit in which he is demanding compensation in the alternative, (1) for total disability, or (2) partial disability, or (3) specific disability, as for the loss of the left index finger. The defendants denied that the plaintiff was entitled to any compensation other than the specific compensation for the loss of the left index finger. Prior to the trial in the District Court, the defendant tendered to the plaintiff all costs necessary for an operation which would result in the amputation of the left index finger at a point deemed best by a physician of plaintiff's own choosing. This offer was made as the plaintiff's index finger was left in a stiffened condition as a result of the injury and, therefore, at all times stood out from the hand, which rendered him permanently and totally disabled to carry out the duties of an iron worker. This tender was refused by the plaintiff and the case was tried and resulted in a judgment by the District Court, under the authority of the case of Leday v. Lake Charles Pipe Supply Co., La. App., 185 So. 655, ordering the plaintiff to submit to the operation for the amputation of his left index finger. The case was continued as an open case to be completed after plaintiff recovered from the effects of the operation, and the Court would then pass on the question as to whether the plaintiff was totally or partially disabled, or only entitled to specific compensation for the loss of the index finger. The plaintiff acquiesced in the judgment ordering the operation, and on June 24, 1948 his finger was amputated at the proximal interphalangel joint. Plaintiff remained away from his work for a period of approximately four weeks, until the last part of July, 1948, and was still working for the defendant company as an iron worker at the time of the second hearing which was November 24, 1948. The District Court on April 4, 1949 rendered judgment denying plaintiff's demand for compensation for total disability or partial disability, but rendered judgment in favor of the plaintiff and against the defendant, awarding him compensation at the rate of $20.00 per week for a period not exceeding thirty weeks, commencing from June 24, 1948 and subject to a credit for whatever compensation had already been paid and further awarded judgment in favor of the plaintiff for $100.00 representing expert witness fees and for all costs of the proceeding. The formal judgment was signed on the second day of May, 1949; however, on the 7th day of April, 1949 motion for a new trial was filed by counsel for the plaintiff, the second ground of which stated that immediately after the testimony in the case was closed and the case submitted, the defendant company discharged the plaintiff and, therefore, plaintiff had no opportunity to get this fact in the record and before the Court, and that if a new trial were granted he would be able to show that he was discharged solely because he was not able to do his work in a satisfactory manner after *Page 138 
the accident and was kept on the payroll under the closing of the evidence in the case. The motion for a new trial was orally denied and the formal judgment signed, from which judgment the plaintiff has appealed to this Court.
While the plaintiff in the lower court had practically abandoned any claim for compensation as of total and permanent disability plaintiff now reurges this claim. We thoroughly agree with the District Judge that the evidence is overwhelming that this plaintiff has not suffered total permanent disability to do work of any reasonable character or the same work he was doing at the time he suffered the injury, and this will be shown by a discussion of the evidence as to whether or not the plaintiff has even suffered partial disability, as this is the main question before the Court.
While there was some evidence taken prior to the amputation of plaintiff's finger, as that testimony was based upon the individual opinions of the witnesses as to plaintiff's ability to work or not to work if the finger was amputated, such testimony must yield to positive medical and lay testimony as to plaintiff's ability or disability after the actual amputation of the finger. There is no doubt that plaintiff was totally and permanently disabled until the finger was amputated, however, he was paid the same wages even though he could not perform all the duties of an iron worker. From the testimony, the amputation was a success, and the results were excellent except that there is medical testimony to the effect that there is approximately a 10 degree disability in the flexion of the stub. Otherwise, from a medical standpoint the hand itself had not been injured, and there could have been some tenderness on the end of the stub, although they testified that this was subjective but could be expected for a while at least. Other than this, we do not find in the testimony of the doctors, anything else wrong with the portion of the finger left. The plaintiff's main complaint, according to his testimony after the amputation, is to the effect that the finger is tender on the right outer tip of the stub and the inner tip and this tenderness was especially noticeable when he handled anything with it or rubbed it against the other finger, and that it felt kind of stiff in the joint which, of course, is the joint where the finger joins the hand. He also complains that it pains him at times. He testified that he couldn't do the usual work of an iron worker, that all he could do was welding, that he could not climb, which seems to be one of his duties as lots of his work is done off of the ground, for the reason that he had no grip in his left hand and he had difficulty in holding bolts and other such articles with which an iron worker must deal in his trade and especially in construction work. He also testified that he attempted to do certain work required of an iron worker which he referred to as "attempting to pull some rope falls," and that the next day his hand was too sore for him to use. He received the same rate of pay as all other iron workers of $2.15 per hour. He also complained that his finger got cold, however, none of the doctors noticed it. Plaintiff estimated the percentage of loss in his ability to work at about 20% or 25%. On cross-examination plaintiff admitted that on the morning of the trial he had been working in the superstructure approximately twenty-five feet above the ground; but stated that he had gone up the ladder and had not climbed up there.
The witness, G. L. Farabee, who testified on the first trial prior to the amputation of plaintiff's finger, stated that even if the finger was amputated, in his opinion it would be three to five years before the plaintiff could perform the duties required of an iron worker. He also testified, when additional testimony was taken after the amputation of plaintiff's finger. It is true, as counsel for plaintiff stated in his argument and brief, that his testimony is quite different. However, a close comparison and analization of plaintiff's testimony would show that there is not too much difference as Farabee testified that he was the foreman under whom the plaintiff worked and that after the amputation plaintiff had performed the same duties as the rest of the crew of iron workers and *Page 139 
was doing it satisfactorily and that he saw no difference in the duties Spillman performed prior to his injury and the duties he performed subsequent to the amputation of the finger. On cross-examination the witness said that he had not heard Spillman complain about his finger since the amputation but that prior thereto he had complained "a few times about pulling on rope falls" because of his sore finger. This witness stated that he had not seen Spillman climb any columns in a long time but it was his opinion that with a little practice he could do so and that on the date of the trial the plaintiff was working up high, but that it was possible that he had gone up on a ladder. The defendant also offered other testimony that the plaintiff had worked fifty or sixty feet in the air sitting on a steel girder burning steel, and that there was no ladder or stairs by which the plaintiff could get up or down.
Dr. H. L. Morgan, witness for the plaintiff, stated that he had amputated plaintiff's finger and that the operation was successful and that he examined this patient approximately six days prior to the trial and he had found some "residual tenderness left at the amputation site" on the outer edges of the stump, but that he thought this tenderness would eventually disappear, although it was possible that it could continue for life. He was asked the following questions:
"Q. In your opinion, is there any resulting disability or impairment of the use of this member effecting the efficiency of Mr. Spillman doing his work as a result of this amputation? A. Yes, there is some.
"Q. What percentage of disability is the result, in your opinion? A. In my opinion not over fifteen per cent."
On cross-examination Dr. Morgan testified that the amputation produced all the good results that he originally anticipated and that it was his belief that the plaintiff was able to climb and that he thought he could perform all the duties of his work; however, the stump as compared to a normal finger, was not worth more than 25%. Under direct examination by Mr. Richardson he was asked the following questions:
"Q. You have made the statement that you would consider such an amputation as this to result in a definite percentage of disability or the impairment of this member to such an extent that Mr. Spillman could not do the same work previously done by him. Do you mean to state that in recommending him for employment you would consider this man fully able to perform the duties attendant to such an occupation as he holds as he would do normally? A. Yes, I do.
"Q. Then this degree of disability that you mentioned would not effect you in anyway in recommending employment? A. No, I don't think so.
"Q. Do you consider that the fact that you recommended this man for employment would mean that his immediate superiors would find him fully qualified to perform his usual duties? A. I think they would."
Further, on direct examination by Judge Ott:
"Q. In all of your testimony in regard to the ability of Mr. Spillman to do his work, are you taking into consideration the facts which already have been explained to you, that he is required to pick up bolts, climb high ladders and otherwise manipulate his hands? A. Yes."
From Dr. Morgan's testimony it would seem that he meant that the plaintiff was suffering no disability to perform the usual and customary duties of an iron worker; however, the mere fact that he had lost a finger would be a loss of efficiency in doing the work of not over 15%. This is taken care of by the award of compensation for the loss of the finger.
There is a report which contains the opinion of Dr. Irvin Cahen to the effect that "The disability of amputation is a minor type in relation to this patient's occupation and it is believed that he is able to continue in his former work assignment," and, "he is of the opinion that this patient should be able to perform his work in the same manner as existed prior to the injury." The doctor stated in this *Page 140 
report that "Disability rating is given as 8% of the hand." It is clear that Dr. Cahen meant just what he said, that when a man loses a finger as in this case, in his opinion there is an 8% disability in the use of that hand. However, this would not prevent that man from doing work of any reasonable character; that is, in this case the duties of an iron worker.
Dr. E. E. Lafferty was also called as a witness by the plaintiff and he testified that he had examined the finger prior to amputation and was present at the time it was amputated and that the operation was performed in a proper manner and was successful and that he had examined the stub a few days prior to the trial and found it well healed with a minimum of scarring and apparently a good result. Dr. Lafferty says that it would not be impossible for the plaintiff to perform the duties of a steel worker, although it might be a little more difficult than before the finger was injured. It was his opinion that even though the finger might be tender Spillman could do the work he was doing, although at first it might be more difficult than before the accident, "but in time he will do it as easily as he once did." He was asked the questions:
"Q. But in your opinion, is there disability as a result of the loss of two phalanges and their tenderness? A. There is a resulting loss and damage to the hand, he will never get the finger back, but he can follow a gainful occupation, and, in my opinion, follow steel work business.
"Q. What would you say would be the resultant percentage of disability in the condition his finger is in right now? A. When I say he can do the same work there would be no disability. But I would say the hand is damaged twenty percent and if the stump is tender, I would say it is damaged twenty-five percent."
Again, as we interpret this doctor's testimony, there is no disability to plaintiff as a result of the injury insofar as the performance of the duties of an iron or steel worker are concerned; however, the doctors have given various estimates by way of percentage as disability in the use of the hand as a result of the loss of the finger. The Compensation Law fixes a definite amount to be awarded for such disability.
Dr. Paul Gard was a witness for the plaintiff and testified that plaintiff's ability to perform his usual duties had been impaired 15%, because he felt "that a whole finger is more valuable to a man than part of a finger." The law recognizes this by awarding compensation for thirty weeks for the loss of a finger.
Taking the testimony of the doctors, the lay witnesses, and the fact that plaintiff was employed and the evidence shows that he performed the duties incumbent upon him as an iron worker in a satisfactory manner and was paid full wages for his work, despite his own testimony, we are of the opinion that he did not suffer any total, permanent disability, nor any partial disability, and that the judgment of the District Court was correct in awarding him compensation as for the loss of the finger. Learned counsel for plaintiff have urged in a motion for a new trial that the case should have been reopened in order that it might be shown that the plaintiff had been discharged because he was unable to perform his duties. Counsel for the defendant, in answer to this, states in his brief, and it is not contradicted in plaintiff's brief, that the plaintiff was discharged on March 18, 1949 and that the reasons for judgment given by the Lower Court were not rendered until April 4, 1949 and that, therefore, plaintiff had an opportunity between those dates to ask the Court to reopen the case but did not do so until after the judgment of the Court. In this brief, counsel states that the Judge of the District Court, in refusing this motion, orally stated that in his opinion the medical testimony submitted was not such as would sustain plaintiff's claim of partial disability, and that while the fact that plaintiff was actually employed had been considered by him. still, even if he had not been so employed, his decision would have been the same. We agree with this statement. We believe from the testimony that this man was earning his wages and doing the work of *Page 141 
an iron worker in the customary and usual manner that it should have been done.
The formal judgment awarded compensation beginning June 24, 1948, the date of the amputation of the finger, because plaintiff had apparently continued to work uninterruptedly and was paid regular wages until that day. It is true that the judgment does not award any interest, and it should be amended to include legal interest on each payment from its due date until paid, and it is so ordered.
As thus amended, the judgment of the District Court is affirmed, defendant to pay all costs.